HENKLE & JOYCE HARDWARE COMPANY, A CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 30922. Filed May 16, 1958.

*Roger V. Dickeson, Esq.,* for the petitioner.

*David Karsted, Esq.,* and *Robert A. Roberts, Esq.,* for the respondent.

Petitioner, in its applications for relief under section 722, I. R. C. 1939,[1] claimed that there should be refunded to it $55,662.12 for the year 1943, $63,849.33 for the year 1944, and $29,862.56 for the year 1945.

The respondent disallowed the petitioner's claims for refund and in his notice of disallowance stated as follows:

In making this determination careful consideration has been given to your applications for relief under section 722 of the Internal Revenue Code; to the reports of examination dated October 14, 1946, and December 3, 1948; to your protests dated April 23, 1947, and April 5, 1949; and to the statements made at the conferences held on July 28, 1947, September 14, 1949, and December 16, 1949. It has been determined that you have not established your right to the relief requested in your applications.

Petitioner contests this determination of the Commissioner. Petitioner, which is entitled to use the credit based on income under section 713, contends that its average base period net income is an inadequate standard of normal earnings because its base period income was depressed ·on account of drought and insect infestation in its trade area during its base period.

. The facts respecting the qualifying factor relied upon are the same as those in *S. N. Wolbach Sons, Inc.,* 22 T.· C. 152 (1954) ; *Sartor Jewelry Co.,* 22 T. C. 773 (1954) ; *Schwarz Paper Co.,* 23 T. C. 605 (1955) ; and *Gillen & Boney,* 27 T. C. 242 (1956). It has been stipulated that the records in those proceedings could be considered as evidence herein.

### FINDINGS OF FACT.

### General.

Petitioner, a Nebraska corporation, with general offices in Lincoln, Nebraska, filed its returns on an accrual basis for the calendar years 1943 to 1945, inclusive, with the then collector of internal revenue at Omaha, Nebraska.

---

[1] All section references are to the Internal Revenue Code of 1939, as amended.

Petitioner was organized in 1906 and from that time throughout the years in question it was engaged in the wholesale general line hardware business. It sold numerous products including such items as hand tools, builders' hardware, house repair supplies, bathroom accessories, lawn and garden tools and accessories, farm hand tools and accessories, forks, shovels, certain automobile accessories, electrical fixtures and supplies, sporting goods and ammunition, guns, fishing tackle, electric appliances, sprayers, chemicals, certain plumbing supplies, and power tools.

Petitioner's customers were retail hardware stores, lumber yards, drugstores, variety stores, and filling stations. Petitioner's trade territory was primarily the State of Nebraska, except the extreme southeast corner, the extreme northeast corner, Omaha, and the area directly north of Omaha between Omaha and Sioux City. It also included the northern counties of Kansas following the main line of the Rock Island Railroad from about Marysville, Kansas, west to the Colorado line. Its trade area also included a group of northern counties in Colorado, eastern counties in Wyoming, and the Black Hills area of South Dakota.

## Drought.

Nebraska is essentially an agricultural State. While it has some manufacturing and other industries which provide employment and sources of income, its economy is based largely on the production and processing of farm products, the most important of which are cattle, hogs, corn, and wheat.

Beginning about 1934 and extending through petitioner's base period, Nebraska and other adjoining areas suffered a severe drought. Average rainfall in Nebraska, over the period 1936 to 1939, inclusive, was less than 70 per cent of normal. Lack of moisture and severe heat at the critical stages of development caused an almost total crop failure of major crops in some of those years.

In addition to the drought, there was also a serious infestation of grasshoppers in Nebraska during the base period years which added to the difficulties caused by short production of most farm crops over large areas of the State. This damage in the State of Nebraska alone was estimated by the United States Department of Agriculture at between 11 and 12 million dollars in each of the years 1936, 1937, and 1938.

The adverse effects of the drought in Nebraska and neighboring States were intensified by the fact that the drought followed a prolonged economic depression, due to low prices for farm commodities and other factors, which began in the early 1930's. These results are reflected in the following statistics relating to "cash receipts from

farm marketings" in the State of Nebraska which were compiled by the United States Department of Agriculture:

| Year | (Thousands of dollars) | | | | |
|------|--------|------|------|-------|---------------------------------|
| | Cattle | Hogs | Corn | Wheat | Total live-stock and crops |
| 1924 | 114,881 | 109,981 | 56,897 | 50,370 | 421,087 |
| 1925 | 121,455 | 141,226 | 42,958 | 47,411 | 444,867 |
| 1926 | 130,683 | 135,306 | 28,783 | 40,987 | 434,244 |
| 1927 | 107,046 | 113,212 | 23,881 | 74,815 | 418,364 |
| 1928 | 138,851 | 121,314 | 61,177 | 55,494 | 484,618 |
| 1929 | 138,316 | 136,824 | 40,645 | 54,941 | 489,102 |
| 1930 | 119,019 | 118,172 | 39,094 | 32,412 | 408,392 |
| 1931 | 90,729 | 79,287 | 18,463 | 20,715 | 279,142 |
| 1932 | 57,506 | 43,426 | 7,736 | 8,368 | 166,669 |
| 1933 | 57,628 | 43,253 | 21,826 | 16,035 | 193,353 |
| 1934 | 78,802 | 53,644 | 16,767 | 13,816 | 227,176 |
| 1935 | 72,216 | 40,185 | 1,690 | 25,204 | 209,398 |
| 1936 | 92,841 | 68,838 | 5,935 | 34,011 | 281,020 |
| 1937 | 91,876 | 39,190 | 2,893 | 39,690 | 250,783 |
| 1938 | 72,603 | 32,436 | 9,507 | 22,312 | 200,521 |
| 1939 | 78,850 | 36,701 | 17,882 | 24,441 | 221,494 |

The totals shown in the last column above include other lesser livestock and livestock products such as dairy products, sheep, poultry, etc., and other lesser crops such as potatoes, beets, oats, hay, etc., not shown separately in the table, but do not show Government payments to farmers, shown below.

The loss of farm production and farm income affected all types of business throughout the drought-stricken area, particularly those which depended largely on farm trade.

As a result of the short production of feed crops during the drought period there was a reduction in the quantity and quality of marketable cattle and hogs. Large quantities of feeds were brought in from other States at additional costs to the farmers, and much of the livestock was sold in poor condition at distress prices. Because of these extra costs of production, there was a proportionately greater reduction in farm net income and purchasing power than there was in gross income.

The farmers of Nebraska, in most instances, exhausted their cash reserves as well as their credit and their spending was generally reduced to bare necessities. Their houses and farm equipment of all types suffered from lack of repairs and proper maintenance. Government and State agencies instituted various relief programs. The Farm Security Administration made many loans and, in some instances, outright grants to distressed farm families. The Farm Service Administration assisted in working out minimum cost subsistence recipes and budgets. The Agricultural Extension Service of the University of Nebraska organized instruction courses for farm families in repairing and, in some instances, making their own household

necessities and personal clothing. Sewing centers were established where overalls, dresses, and other articles, even toys, were made and distributed free to needy families. Altogether about 4 million garments and as many other articles were made and distributed free to Nebraska families. At the beginning of 1938, over 200,000 persons, approximately 15 per cent of the total population of Nebraska, were on some form of relief.

The distress conditions described above prevailed not only among the farm families but also in the urban areas, and particularly in the small towns which largely depended upon farm income. The following table shows the total income payments and the per capita income payments to individuals in Nebraska and in the United States as a whole over the period 1929 to 1939, inclusive, as published by the United States Department of Commerce:

| Year | (Millions of dollars) Total income payments | | (Dollars) Per capita income payments | |
| --- | --- | --- | --- | --- |
| | United States | Nebraska | United States | Nebraska |
| 1929 | 82,617 | 764 | 680 | 557 |
| 1930 | 73,325 | 749 | 596 | 544 |
| 1931 | 61,971 | 578 | 500 | 421 |
| 1932 | 47,432 | 344 | 380 | 251 |
| 1933 | 46,273 | 374 | 368 | 275 |
| 1934 | 53,038 | 378 | 420 | 279 |
| 1935 | 58,558 | 476 | 460 | 353 |
| 1936 | 68,000 | 534 | 531 | 399 |
| 1937 | 72,211 | 549 | 561 | 412 |
| 1938 | 66,045 | 509 | 509 | 384 |
| 1939 | 70,601 | 523 | 539 | 397 |

Cash farm income from marketings of crops and livestock and Government payments, including all cash agricultural payments, such as rentals, price supports, conservation, parities, etc., for the State of Nebraska, over the period 1924 to 1939, inclusive, were as follows:

| Year | (Thousands of dollars) | | |
| --- | --- | --- | --- |
| | Total crops and livestock | Government payments | Cash farm income and Government payments |
| 1924 | 421,087 | | 421,087 |
| 1925 | 444,867 | | 444,867 |
| 1926 | 434,244 | | 434,244 |
| 1927 | 418,364 | | 418,364 |
| 1928 | 484,618 | | 484,618 |
| 1929 | 489,102 | | 489,102 |
| 1930 | 408,392 | | 408,392 |
| 1931 | 279,142 | | 279,142 |
| 1932 | 166,669 | | 166,669 |
| 1933 | 193,353 | 1,011 | 194,364 |
| 1934 | 227,176 | 23,496 | 250,672 |
| 1935 | 209,398 | 33,125 | 242,523 |
| 1936 | 281,020 | 17,293 | 298,313 |
| 1937 | 250,783 | 17,468 | 268,251 |
| 1938 | 200,521 | 15,371 | 215,892 |
| 1939 | 221,494 | 28,078 | 249,572 |

The population of Nebraska and the percentage thereof which was urban for the years 1920 through 1950, were as follows:

| Year | Population | Per cent increase over preceding census | Per cent urban |
|------|-----------|------------------|----------|
| 1920 | 1,296,372 | +8.7 | 31.3 |
| 1930 | 1,377,963 | +6.3 | 35.3 |
| 1940 | 1,315,834 | −4.5 | 39.1 |
| 1950 | 1,325,510 | +0.7 | 46.9 |

The following schedule shows the per cent of actual sales in 1939 to the retail sales in 1929 for stores which dealt in products sold by petitioner:

| Stores | United States | | | Nebraska | | |
|--------|---------------|--|--|----------|--|--|
| | Sales (add 000) | | Per cent 1939 to 1929 | Sales (add 000) | | Per cent 1939 to 1929 |
| | 1929 | 1939 | | 1929 | 1939 | |
| Hardware | $706,053 | $629,276 | 89.13 | $10,335 | $9,106 | 88.11 |
| Auto accessory | 599,295 | 523,685 | 87.38 | 7,155 | 6,212 | 86.82 |
| Variety | 904,147 | 976,801 | 108.04 | 9,572 | 9,051 | 94.56 |
| Lumber | 1,981,284 | 1,478,459 | 74.62 | 44,927 | 20,050 | 44.63 |
| Household appliances | 379,704 | 484,698 | 127.65 | 3,256 | 4,249 | 130.50 |
| Filling stations | 1,787,423 | 2,822,495 | 157.91 | 29,414 | 40,499 | 137.69 |

*Petitioner's Financial Statistics.*

The following schedule summarizes petitioner's income and expenses for the years 1922 to 1939, inclusive, (.00 omitted):

| Year | Net sales | Gross profit | Other income | Operating expense | Adjustments [1] | Excess profits net income | Per cent net income to sales |
|------|-----------|--------------|--------------|-------------------|-------------|------------------|--------------|
| 1922 | $977,622 | $201,480 | $3,827 | $171,021 | ($921) | $35,207 | 3.60 |
| 1923 | 1,024,882 | 215,233 | 1,908 | 179.609 | ---------- | 37,531 | 3.66 |
| 1924 | 1,128,767 | 241,506 | 2,483 | 196,848 | (590) | 46,549 | 4.12 |
| 1925 | 1,247,018 | 263,549 | 2,254 | 202,487 | 723 | 64,039 | 5.14 |
| 1926 | 1,202,844 | 257,345 | 1,656 | 208,253 | 1,047 | 51,795 | 4.31 |
| 1927 | 1,175,132 | 248,881 | 2,400 | 204,239 | 5,044 | 52.086 | 4.43 |
| 1928 | 1,201,205 | 264,950 | 1,543 | 197,946 | 480 | 68,938 | 5.74 |
| 1929 | 1,234,063 | 260,107 | 2,034 | 207,669 | ---------- | 54,471 | 4.41 |
| 1930 | 1,094,316 | 228,317 | 2,690 | 205,922 | (172) | 24,913 | 2.28 |
| 1931 | 790,926 | 156,907 | 2,940 | 179,588 | ---------- | (19,740) | (2.50) |
| 1932 | 555,042 | 110,934 | 2,798 | 140,056 | ---------- | (26,323) | (4.74) |
| 1933 | 503,268 | 122,940 | 4,320 | 129,224 | ---------- | (1,963) | (.39) |
| 1934 | 549,401 | 125,757 | 4,960 | 129,875 | 958 | (105) | (.02) |
| 1935 | 605,396 | 134,059 | 4,556 | 123,500 | 1,875 | 14,068 | 2.42 |
| 1936 | 640,643 | 146,574 | 2,666 | 123,763 | (245) | 25,232 | 3.94 |
| 1937 | 593,653 | 150.570 | 2,635 | 131,837 | (164) | 21,699 | 3.66 |
| 1938 | 548,035 | 123,449 | 4,135 | 127,684 | 1,000 | (1.098) | (.20) |
| 1939 | 572,082 | 131,051 | 2,411 | 125,876 | 38 | 7,548 | 1.32 |

[1] Adjustments represent revenue agent's adjustments and/or profit or loss on assets sold.

Petitioner's average base period net income, hereinafter referred to as ABPNI, is as follows:

| Year | Amount |
|---|---|
| 1936 | $25, 232. 67 |
| 1937 | 21, 699. 48 |
| 1938 | (1, 098. 16) |
| 1939 | 7, 548. 98 |
| Total | 53, 382. 97 |
| Average | 13, 345. 74 |

Petitioner's excess profits credit based on invested capital is as follows:

| Year | Amount |
|---|---|
| 1943 | $36, 782. 51 |
| 1944 | 37, 500. 90 |
| 1945 | 38, 086. 35 |

Petitioner's excess profits net income and excess profits tax paid for 1943 to 1945, inclusive, are as follows:

| Year | Excess profits net income | Excess profits tax paid |
|---|---|---|
| 1943 | $103, 629. 31 | $55, 662. 12 |
| 1944 | 122, 178. 48 | 63, 849. 33 |
| 1945 | 103, 049. 02 | 46, 993. 09 |

Because of the drought and, to a lesser extent, insect infestation and their effect on farm income and business generally in the State of Nebraska, petitioner's earnings were depressed during the base period years so that its ABPNI was an inadequate standard of normal earnings.

The excess profits tax paid by petitioner for the taxable years 1943 to 1945 was not excessive and discriminatory. Its constructive average base period net income (hereinafter sometimes referred to as CABPNI) is not large enough to produce excess profits credits greater than the excess profits tax credits based on invested capital which it used in its returns and which were allowed by the respondent.

OPINION.

BLACK, *Judge:* Petitioner is a wholesale general line hardware dealer in Lincoln, Nebraska. Its trade area consists of a large portion of the State of Nebraska and portions of some nearby States. In issue are its claims for refund of excess profits taxes for 1943 to 1945, inclusive, under section 722. Respondent allowed petitioner excess profits credits based on invested capital in the amounts of $36,782.51, $37,500.90, and $38,086.35 for the years 1943, 1944, and 1945, respectively. Petitioner was entitled to use credits based on the income method if they resulted in a larger credit but they were

greatly exceeded by the invested capital credits. Petitioner now seeks relief under section 722, claiming on brief that it is entitled to use a CABPNI of $51,800,[2] which will produce credits greater than its invested capital credits already allowed.

We have found as an ultimate fact that during petitioner's base period (1936 to 1939) a drought and, to a lesser extent, insect infestation in its trade area caused a depression in its base period earnings so that its ABPNI of $13,345.74 is an inadequate standard of normal earnings.[3] Respondent does not dispute this and it accords with our findings in *Wolbach, Sartor, Schwarz,* and *Gillen & Boney,* all *supra,* where the same qualifying factor under section 722 was involved.

Since the qualifying factor has been established, the petitioner, in order to obtain relief, must prove that its normal base period earnings, i. e., obviating the depression in earnings caused by the drought and the insect infestation, would have been great enough to produce credits in excess of the invested capital credits which respondent has allowed. *Sartor, Schwarz,* and *Gillen & Boney,* all *supra.*

The petitioner's ABPNI was $13,345.74. Petitioner contends that, absent the drought and insect infestation, its average base period earnings would have been $51,800. This amount represents the average earnings for the period 1924–1930, which (period) it contends was "normal." In support of its contention petitioner relies on *Wolbach, supra.* In *Wolbach* we stated (p. 160):

No single year or group of years is in itself typical of normal earnings of the business for the base period, but appropriate adjustments may be made to reflect normal base period conditions. We have selected the group of years from 1924 to 1930, inclusive, as our starting point, because they require the least adjustment for the purpose of relating them to normal base period conditions. We have, according to our own best judgment, adjusted both sales and profit ratios for this purpose. We have also adjusted profit ratios to reflect reasonable salaries of partners to the extent supported by the record. Adjustments have been made giving effect to the elements of dissension and mismanagement during the base period as disclosed by the record. * * *

In *Wolbach* the taxpayer for the 1924–1930 period had actual average sales of $818,000, rate of profit of 6.2 per cent, and net profit of $51,000. After giving effect to the appropriate adjustments, we determined normal base period sales to be $737,300. Applying a normal profit rate of 3.35 per cent, we arrived at reconstructed earnings of $24,700.

---

[2] A CABPNI of $76,856.13 was claimed in the petition.

[3] The petition alleges that petitioner qualifies for relief under section 722 (b) (1), (2), (3), (4), and (5). On brief, however, it seeks to qualify on account of the drought and insect infestation, which is a qualifying factor under section 722 (b) (2), *Sartor Jewelry Co.,* 22 T. C. 773 (1954). No findings have been requested regarding the other qualifying factors under section 722 (b) and we deem the other allegations to have been abandoned.

It is clear that petitioner's proposed reconstruction, i. e., merely using average earnings during the 1924–1930 period without adjustments, does not comport with the reconstruction in *Wolbach*. The petitioner's reconstruction fails to make the proper adjustments for any differences between the 1924–1930 period and the base period. Petitioner has not shown that the 1924–1930 period was normal for it. And, assuming that the 1924–1930 period was normal in petitioner's case, it has not shown that its base period operations were so similar to the 1924–1930 operations as not to require any adjustment. In the absence of evidence, we could hardly assume that no adjustments should be made to its 1924–1930 average earnings in order to achieve normal earnings for a droughtless base period. Supporting this conclusion is the evidence introduced by the respondent which indicates that adjustments should be made for general economic conditions and changes in channels of distribution of the products sold by petitioner.

Although we have rejected the petitioner's proposed CABPNI we have carefully examined the evidence in an attempt to arrive at a fair and just amount representing normal earnings. However, even applying a reasonable profit ratio, based on petitioner's experience, to the highest actual average sales figures for a reasonable period of time, the resulting net earnings would not produce a credit large enough to give the petitioner any relief. To grant the petitioner the relief sought, we would have to isolate the years 1924–1930, which include the 6 best years in the 1922–1939 period, in making a reconstruction. Such reconstruction in our opinion is unrealistic.

Since we cannot reasonably reconstruct petitioner's earnings to an amount which is large enough to produce credits in excess of the petitioner's invested capital credits, we must hold for the respondent.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*